# CASES

## ARGUED AND DETERMINED

### IN THE

# United States Circuit and District Courts

---

## In re. APPOINTMENT OF "SUPERVISORS OF ELECTION" IN THE STATE OF DELAWARE.

### *(Circuit Court, D. Delaware.* January 24, 1880.)

U. S. REV. ST. § 2011—WORD "REGISTRATION" CONSTRUED.—The word "registration" used in the U. S. Rev. St. § 2011, has a general, not a technical meaning, and indicates any list or schedule containing a list of voters, the being on which constitutes a prerequisite to vote, unless there is a system of registration described by act of congress, and applied by the act as the only registration of voters under the law.

ASSESSMENT LISTS.—The Delaware assessment lists, made primarily by the assessors of the different hundreds, and completed by the levy courts of the different counties, are such lists, though they contain not only a list of voters, but of other persons besides.

REGISTRATION OF VOTERS—EVIDENCE.—The registration of voters intended by the act of congress need not be conclusive evidence that the person registered is qualified to vote.

LIST OF VOTERS—REGISTRATION OF VOTERS.—The clerk of the peace, in Delaware, is required by the state statutes to make and certify, for the use of the inspector of the election, "an alphabetical list for each hundred, and election district where a hundred is divided into two or more election districts, of the names of all the free white male citizens of the age of twenty-one years and upwards, residing and assessed in such hundred or election district." *Held,* that such list is a registration of voters within the meaning of the above sections of the United States Revised Statutes. Constitutionality of the above statutes not decided.

v. 1, no. 1—1

Motion for the appointment of supervisors of election, under the Rev. St. §§ 2011–2015. The United States Statutes and the statutes of the state of Delaware, applying to the case, are set forth in the opinion of the court.

Hon. EDWARD G. BRADFORD, U. S. District Judge, assigned by the circuit judge, (Hon. Wm. McKennan,) to perform and discharge the duties devolving upon him, presiding.

*Anthony Higgins*, for the motion.

*George H. Baker* and *George Gray*, Attorney General, *contra.*

BRADFORD, J. The provisions of the United States laws which it is supposed covers this case are found in sections 2011, 2012, 2013, 2014 and 2015 of the Revised Statutes of the United States, and in these words:

"Section 2011. Whenever, in any city or town having upwards of 20,000 inhabitants, there are two citizens thereof, or whenever, in any county or parish, in any congressional district, there are ten citizens thereof, of good standing, who, prior to any registration of voters for an election for representative or delegate in the congress of the United States, or prior to any election at which a representative or delegate in congress is to be voted for, may make known, in writing, to the judge of the circuit court of the United States for the circuit wherein such city or town, county or parish is situated, their desire to have such registration, or such election, or both, guarded and scrutinized, the judge, within not less than ten days prior to the registration, if one there be, or, if no registration be required, within not less than ten days prior to the election, shall open the circuit court at the most convenient point in the circuit.

"Sec. 2012. The court, when so opened by the judge, shall proceed to appoint and commission, from day to day and from time to time, and under the hand of the judge, and under the seal of the court, for each election district or voting precinct in such city or town, or for such election or voting precinct in the congressional district, as may have applied in the manner herein prescribed, and to revoke, change or renew such appointment from time to time, two citizens, residents of the city or town, or of the election district or voting pre-

cinct in the county or parish, who shall be of different political parties, and able to read and write the English language, and who shall be known and designated as supervisors of election.

"Sec. 2013. The circuit court, when opened by the judge, as required in the two preceding sections, shall therefrom and thereafter, and up to and including the day following the day of election, be always open for the transaction of business under this title, and the powers and jurisdiction hereby granted and conferred shall be exercised as well in vacation as in term time; and a judge, sitting at chambers, shall have the same powers and jurisdiction, including the power of keeping order and of punishing any contempt of his authority, as when sitting in court.

"Sec. 2014. Whenever, from any cause, the judge of the circuit court, in any judicial circuit, is unable to perform and discharge the duties herein imposed, he is required to select and assign to the performance thereof, in his place, such one of the judges of the district courts within his circuit as he may deem best; and, upon such selection and assignment being made, the district judge so designated shall perform and discharge, in place of the circuit judge, all the duties, powers and obligations imposed and conferred upon the circuit judge by the provisions hereof.

"Sec. 2015. The preceding section shall be construed to authorize each of the judges of the circuit courts of the United States to designate one or more of the judges of the district courts within his circuit to discharge the duties arising under this title."

There is no question raised now as to the appointment of supervisors of election to guard and scrutinize the elections. But it is denied that there is any registration of voters within the meaning of the act of congress, and that therefore the appointment of supervisors of election, with power to guard and scrutinize the assessment lists in the hands of the assessors and in the hands of the levy court, and the list of voters furnished by the clerks of the peace in the respective

counties of the state for the use of the inspectors of election, is not warranted by law.

As this law, leaving out the question of constitutionality, is meant to be fair and impartial in its operation, and as its object and purpose is the protection to each citizen of the right of the elective franchise, both by securing his own vote and preventing the illegal votes of others, the construction of the act should be a liberal one, and such as to carry into effect the manifest intention of the framers of the law. And, while the fact of penalties attached to the violation of the law should, as in every case demanding serious investigation, make more imperative the necessity for the judge to give a careful investigation to the case, I know of no rule of interpretation arising from that fact which should require a narrow and technical construction to such a statute—a statute which is eminently an enabling one.

We are then brought to the consideration of the question, what was the manifest intention of congress in the use of the words "registration of voters?"

It will hardly be denied that, if these lists made by the assessors and the levy courts are lists of such a character that to be placed on them is a prerequisite to the right to vote, the guarding and scrutinizing such lists give the means of remedying the evil which congress designed to be remedied. And if it is a sound rule of interpretation or construction of a law that such a construction or interpretation should be given as will remove the evil sought to be removed, and protect the rights sought to be protected, then, unless there is something on the face of the acts of congress which in terms denies the applicability of the registration of voters therein named to the assessment lists under the laws of Delaware, an adherence to this rule would compel the court to give to such a system the substantial character of a registration of voters.

It is admitted in argument that if there was a system of registration of voters *eo nomine*, in this state, then the statute would apply, and the supervisors could guard and scrutinize such lists.

Now such registry lists, *eo nomine*, are imperfect; they only make a *prima facie* case. No voter's right is extinguished by being omitted from that list, and no voter's right is secured by being illegally placed on it. The wrong done can be remedied at any time prior to the election; and yet such imperfect lists as these, under the name of registration of voters, congress, in the interests of the purity of the elective franchise, has ordered to be guarded and scrutinized. Now suppose, under the system of laws of the state of Delaware, the assessor makes list of persons owning and not owning property, above the age of 21 years, and is required by law under severe penalties to place on that list every freeman in his hundred above the age of 21 years; and suppose, after the the list is completed and corrected by the levy court in the latter part of March of every year, it is found that citizens qualified in every other respect to vote have, through inadvertence or corruption, been omitted from the lists; and suppose that omission is fatal, beyond the possibility of correction—an actual and utter extinguishment of such a citizen's right to vote—can it be held with any reason that such a state of facts does not constitute a registration of voters within the true meaning and intent of congress? It is admitted by counsel for the objectors that the law will apply to imperfect and inconclusive lists of voters, provided they are called by law "registration of voters;" but to apply that law, when the necessity of guarding and scrutinizing is vastly increased, from the fact that the omission of the name from the assessment list is absolutely without remedy, is held by them to be unwarranted.

Now, what is there in the words "registration of voters" that should require such a construction of the law as to defeat the manifest intention of congress? It will be borne in mind that there is no such expression as "system of registration" or "registry laws," and the only words to have a construction given to them are "registration, if one there be." What is registration? It is the act of making a list, or catalogue, or schedule, or register. The word "registration" is an ordinary one; it is used in a generic sense, not technical;

and, when applied to voters, unless there is a system of registration described by act of congress as such, and applied by the act as the only registration of voters under the law, it is any list, or register, or schedule containing names, the being on which lists, registers, or schedules constitutes a prerequisite to voting. Any other construction would utterly defeat the purpose and intent of congress.

It is manifest that, under the construction contended for by the objectors, any state having in substance such a registration of voters could avoid the operation of the act by altering the name of the fact of registration, or altering the state laws in such a manner as to create a system of registration different from that contemplated by the act of congress, as likely to be most prevalent in the majority of the states. The registration of voters must be widely variant in different states of the Union, and because there are some acts which, under our system, supervisors may not be able to perform, but which, in the contemplation of congress, might be performed in some other states, it does not follow that the former states have no such registration of voters as was contemplated by the act of congress. Is there *fit* and sufficient subject-matter for this act to work upon, is the pertinent question, and not—have we such a system of registration in all particulars as congress contemplated might exist in some of the states? The constitutional provision in reference to voting is in these words:

Art. 4. And in such elections every free white male citizen of the age of 22 years or upwards, having resided in the state one year next before the election, and the last month thereof in the county where he offers to vote, and having, within two years next before the election, paid a county tax which shall have been assessed at least six months before the election, shall enjoy the right of an elector; and every free white male citizen of the age of 21 years, and under the age of 22 years, having resided as aforesaid, shall be entitled to vote without payment of any tax.

The laws of the state governing the duties of assessors and the levy court are to be found under the titles "Levy Court," on page 60 and following, and of "Assessors," on page 78 and

following, and under title of "Valuation of Property," and in other places, in the Revised Statutes of Delaware, which we do not deem necessary to quote at large, an examination of which will, we think, show the truth of the following propositions:

1. There are officers appointed to make lists of voters, or to put on the assessment lists the names of persons who, if not thus assessed, will, though entitled in all other respects, be deprived of the right of voting.

2. Those officers are the assessors for the different hundreds and the levy courts of the different counties.

3. There are not only lists such as have been spoken of, and men authorized to make them, but there are times and places fixed by law for their examination, investigation, addition to and correction.

4. The laws of Delaware contemplate their being guarded and scrutinized by its own citizens.

5. There are times and places fixed by law for guarding and scrutinizing those lists in the hands of the assessor, from the tenth day of January to the last Saturday in that month, and in the levy court during the months of February and March.

6. Before the assessor, objections or challenges to a name being put on the lists can be made, and he is bound to entertain those objections, (for if he fraudulently places names on his assessment lists he is liable to indictment,) and on the proper application and evidence he is bound to place names on his lists which have been omitted.

7. The levy court is bound to entertain applications for placing names omitted on the assessment lists, though it may not take any off which may have been returned by the assessor. So that here is time and place for guarding and scrutinizing.

8. The clerk of the peace is bound to "make and certify, for the use of the inspectors of the election, in the month of August in each year of the general election, *an alphabetical list*, for each hundred and election district where a hundred is divided into more than one, of the names of all the

free male citizens of the age of 21 years and upwards residing and assessed in such hundred or election district." He shall write the word "naturalized" opposite the name of any one on said list who appears from evidence in his office to have been naturalized; and here, by this officer, is virtually made a registration of voters—a list making a *prima facie* case of right on the payment of tax—a list given to and used by the inspector of elections for that purpose, whose duty it is made to write the word "voted" opposite the name of *every one* who has voted.

It will be noticed that the clerk of the peace does not simply take from the assessment lists in his official custody the names of those assessed, but he also has to decide and fix on the residence of the persons on this list, and certifies the place of residence, as well as the fact of assessment, thus making a *prima facie* case of right to vote on the payment of a tax. Now this is not a complete registration or list of voters, because of the possible change of the residence of voters after the first of September, or from other causes, but it is as complete as the clerk of the peace can make it, and is in close analogy, and, indeed, almost identical with lists of voters made out under a system of registry laws, *eo nomine*, which exists in Pennsylvania; the only substantial difference being that *there* the assessor makes out the list of voters from the *assessment* lists he has previously made, and here the clerk of the peace makes out the list of voters from the assessment lists which have been made by the assessors, perfected in the levy court.

Why is not this list made out by the clerk of peace such an one as should be guarded and scrutinized? It is made by a public officer, charged with the performance of a duty, who has office hours and a known place for the transaction of public business. If he is a dishonest and unprincipled man he has the means of perpetrating great frauds, and in no way more easily than by placing on this list of voters men who are not assessed.

We have argued this question hitherto on two grounds: *First*, that it was necessary to give such a construction to the

term "registration of voters," as used by congress, as to embrace the system of laws in the state of Delaware governing the assessment of her citizens, in order that the manifest intention of congress should be carried out; and, *second*, we have endeavored to show that while congress may have contemplated provisions of registry laws existing in other states, which have no existence here under our system, there still remains sufficient subject-matter to make the application of those laws simple, practicable and easy. Under these circumstances, unless I can find in the argument of counsel insuperable objections, I shall be compelled to give such a construction to our laws as to give them substantially the character of a registration of voters as contemplated by congress.

It is urged by both the counsel for the objectors that the registration of voters, to meet the requirements of the act of congress, must be a registration of voters "*qua* voters" or "as voters" alone, and one of counsel goes so far as to say it ought to be conclusive evidence of all the qualifications of the voters, or the act of congress would not embrace it as a "registration of voters."

This latter idea is thoroughly refuted by the settled practice and construction of the registration laws of Pennsylvania, which afford no conclusive evidence of a man's right to vote if upon it, or of the deprivation of a man's right if not on it, as will appear from Purdon's Digest of Pennsylvania Laws, too voluminous to be here cited (see chapter "Elections," Annual Digest for 1873–78).

But have we not shown already that the clerks of the peace in each county, by authority of law, make up lists of voters *as such voters* affording *prima facie* evidence of the right to vote upon the payment of tax, for the use of the inspectors of election in each election district in the state? Can it be said that that is not a list of voters on which, by requirement of law, the word "voted" is to be marked opposite the name of every person who does vote; and when these lists are to be retained for the purpose of evidence of the fact of voting?

An examination of the statutes hereinafter cited of the

state of Delaware, referring to the action of the clerks of the peace in making out these lists, will show that he performs other than mere clerical duty in taking names from the assessment lists; in fact, some of them are *quasi* judicial, such as determining the fact of naturalization of foreigners, and determining and certifying to the residence of all persons assessed. They are in part as follows:

"Section 21. He shall make and certify under his hand and official seal, and deliver to the sheriff of his county, in the month of August, in the year of holding the general election, an alphabetical list for each hundred, [and election district where a hundred is divided into two or more election districts,] of the names of all the free white male citizens of the age of 21 years and upwards, residing and assessed in such hundred [or election district;] and when it appears by any certificate recorded in his office that a person named in said list has been naturalized he shall write the word 'naturalized' opposite his name. If the general election be not held in any year on the same day as the election for electors of president and vice president, he shall, in that year, make, certify, and deliver two such lists.

"Section 5. The said alphabetical list shall be made and certified by the clerk of the peace of the county, under his hand and seal of office; and, as to every person whose name shall be contained in such list and who shall appear by any certificate recorded in the office of said clerk to be naturalized, the word 'naturalized' shall be distinctly affixed to the name of every such person. Such alphabetical list shall be delivered by the clerk of the peace to the sheriff on some day in the month of August next preceding the general election.

"Section 18. Each qualified elector shall deliver a single ballot, containing the names of the person voted for, to the inspector, who shall audibly pronounce the name of the elector, which shall be entered in words at length upon a list of polls to be kept by each of the clerks, whom the judges shall direct to that duty, and one of the judges shall write against it, on the alphabetical list delivered by the sheriff to the inspector aforesaid, the word '*voted.*' There shall be no

examination of a ballot, except to determine that it is single; and the inspector shall, immediately after pronouncing the elector's name, put the ballot into the box in his presence, unless the vote shall be objected to.

"Section 33. Each inspector shall, on Thursday preceding the day of the general election, deliver into the office of the clerk of the peace of his county the oaths or affirmations that shall have been signed by the inspector and judges of the election in his hundred, and the certificate of said oaths or affirmations being administered, to be made and signed as directed in the thirteenth section, and the two lists of the polls kept at the election as before directed, and the alphabetical list aforementioned, with the notes of 'voted' as, the same shall have been made thereon; all of which shall be filed in the office of said clerk, and shall be public records, and as such admissible as evidence."

Now, on a comparison of the two systems of Pennsylvania and Delaware, in what respect does the Pennsylvania assessor present on his list of voters a stronger case of *prima facie* right to vote than does the clerk of the peace on his? By the former law the assessor makes out from his own assessment an alphabetical list of persons entitled to vote. By the law of Delaware the clerk of the peace makes out an alphabetical list from the lists of the county in his official possession of all freemen over the age of 21 years "residing and assessed in each hundred or election district." The assessor in Pennsylvania enters the letter "N" opposite the names of naturalized persons; the clerk of the peace writes the full word "naturalized" opposite the foreigner's name. The Pennsylvania assessor is required to write the word "vote," while the inspectors of election in Delaware write against each name the word "voted," as the act of voting takes place.

So it will be seen there is a great similarity between these two systems, and my last proposition on this subject is this, that if the test of the character of the list as made out by the clerk of the peace as a *list of voters* is the making a list presenting a *prima facie* right to every one on the list to vote on the payment of a tax, then that test is found as fully to

exist in the lists made by the clerk of the peace as in the registration of voters made by the assessor under the Pennsylvania laws. But it has been argued by the objectors that even if these lists made out by the clerk of the peace were lists of voters, the guarding and scrutinizing must be confined to the action of the clerks of the peace; that it cannot be extended to the action of the hundred assessors or the action of the levy court.

The answer to this is a simple and easy one. The determination of the essential element of the right to vote, an indispensable prerequisite, viz., that of assessment, by the constitution of the state, is primarily made by the assessor, and finally determined by the levy court in the completion of their assessment lists, and that determination, expressed by the act of assessment itself, becomes incorporated into and a part of that list of voters made out by the clerk of the peace. A denial, therefore, of the right to guard and scrutinize the action of the assessors and the levy court in that respect would be fatal to the right of the voter, as the period and opportunity would have passed by when he could claim his right to be assessed—the essential prerequisite, as before stated, of the exercise of the right of suffrage.

The attorney general, Mr. Gray, assumes that we have no registration of voters within the meaning and intent of the act of congress, and then argues that the acts of the assessors and members of the levy court cannot be guarded and scrutinized under any of the provisions of section 2011, or congress would have added the comprehensive language of section 2005.

But, as I have shown that we have in substance a registration law within the clear meaning and intent of the act of congress, the argument can have no application.

Both of the counsel contend that the lists in the hands of the assessors and in the hands of the levy court are not lists of voters, because in addition to the voters others are assessed, such as females and non-residents. Now, while it may not be a list containing all the qualifications of voters, it is a list which embraces the names of every one having the prerequi-

site qualification of assessment, an omission from which deprives one entitled to be on it of the right of voting. It may not be, in the estimation of counsel, a list of voters, but it has this great significancy of being such a list that any man not found upon it is deprived of his right to vote.

Thus these lists have a dual aspect, and are as much a list of voters as of assessed persons. This supposed difficulty does not apply to the lists of voters made out by the clerks of the peace.

The learned attorney general, whose opinion is entitled to great respect by reason of his official position and well known ability as a lawyer, has insisted that it would be impossible to enforce the criminal proceedings of the sections of the United States Revised Statutes regarding obstruction or hindrance of supervisors so appointed; holding that no indictment to cover such an offence could be drawn because the warrant claimed for the authority of these supervisors cannot be found in the United States Statutes. With all respect to the learned attorney general, this is begging the whole question. If there is substantially a registration of voters in this state within the true meaning and intent of the act of congress, as we have already indicated there is, there would be no difficulty in framing an indictment against any state officer charged with the duties of registration of voters, either under the section in question or under section 2005, for any obstruction or hindrance to supervisors in the performance of the duties imposed on them by congress.

I have thus at some length argued the novel and interesting questions which have been presented for my solution. I may have erred in the conclusion at which I have arrived. If I entertained doubts of the correctness of my conclusion which were not of the gravest character, I should feel bound to give the benefit of those doubts in favor of that construction which was in good faith intended to purify and protect the elective franchise rather than that which would curtail and diminish the opportunity of doing the same. If I am right in my conclusion I would do a great wrong in not making these appointments, while, if I err in my legal judgment,

no injury is done to any one—no man's rights are invaded or affected injuriously by the appointments—and ample opportunity will be given, before a full bench, on full argument, to have this disputed question finally determined. I shall therefore make the appointments of supervisors of election as suitable names shall be presented to me by the chief supervisor of elections for this district.