**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BRENDHAN B. HARRIS,
<u>Plaintiff-Appellee,</u>

v.

CITY OF VIRGINIA BEACH,
<u>Defendant-Appellant,</u>

and

G. M. VAN AUKEN, III, Lieutenant;
M. E. BEANE, Captain; W. W.
BAKER, Captain; D. G. MCCLOUD,
Major; CHARLES R. WALL, Chief,

No. 96-1743

individually and as Officers of the
Department of Police, City of
Virginia Beach, Virginia; FAGAN D.
STACKHOUSE, individually and as the
Director of the Department of
Human Resources, City of Virginia
Beach, Virginia; JAMES K. SPORE,
individually and in his official
capacity as City Manager of the
City of Virginia Beach, Virginia,
<u>Defendants.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CA-93-1151-2)

Argued: January 28, 1997

Decided: March 31, 1997

Before HALL, LUTTIG, and WILLIAMS, Circuit Judges.

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Lawrence Steven Emmert, CITY ATTORNEY'S
OFFICE, Virginia Beach, Virginia, for Appellant. Abram W. Vander-
Meer, Jr., CLARK & STANT, P.C., Virginia Beach, Virginia, for
Appellee. **ON BRIEF:** Richard Jay Beaver, CITY ATTORNEY'S
OFFICE, Virginia Beach, Virginia, for Appellant. Timothy W. Dor-
sey, CLARK & STANT, P.C., Virginia Beach, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The City of Virginia Beach appeals an order of the district court,
on remand from this court, reentering a judgment against it and in
favor of Brendhan Harris in Harris' suit alleging wrongful
discharge
under Virginia common law. We reverse the judgment and remand
for a new trial.

I.

Brendhan Harris was a police officer for the City of Virginia
Beach. On August 28, 1992, Harris was dispatched to an apartment
complex to investigate an unauthorized entry. On arrival, he spoke
to
the complainant, Terry Grey, and he concluded that the "intruder"
was
likely just the complex's maintenance man. He and Grey then went
to see the apartment manager, Colette Goodfellow, in an attempt to
confirm Harris' conclusion.

Goodfellow produced a written work order for repairs to Grey's apartment. Grey snatched the order from Goodfellow's hand and refused to return it. Harris grabbed Grey's wrist in an attempt to retrieve the paper. At this point, Harris was accosted by a bystander, Deidre Gamble, who is Grey's sister. Harris and Gamble struggled briefly, until Harris sprayed Gamble with pepper gas.

At some point during the altercation, another officer, Anthony Ortiz, arrived on the scene. Ortiz reported to Harris' supervisor, Lieutenant Gary Van Auken, that Harris had acted improperly. Harris also reported the incident to Van Auken while he was transporting Gamble to the hospital.

After Gamble was treated, Harris took her to a magistrate to have her charged with assault and battery. There was a message waiting for him at the magistrate's office to call Van Auken. Van Auken instructed Harris to release Gamble so that she could file a complaint against Harris with the department's Internal Affairs Division and to do nothing further in the matter.

Harris consulted a lawyer. He then gave a statement to Internal Affairs, and immediately thereafter swore out warrants against Gamble and Grey. The warrant against Gamble was served, but, on the order of Captain E. E. Rorrer, Harris relinquished the Grey warrant to Van Auken. Van Auken placed the warrant in his desk drawer.

On September 30, 1992, Gamble's case was called for trial. Van Auken appeared and produced a letter he had prepared and initialed for Captain M. E. Beane. The letter stated that the City desired to nolle prosequi the case. The case was dismissed without prejudice.

Internal Affairs then released a report critical of Harris' actions, finding in particular that his use of pepper spray on Gamble was an excessive use of force. Based on the Internal Affairs report, the department suspended Harris for four hours, with an additional four hours for disobeying Van Auken's order not to pursue further charges against Gamble.

In a letter dated September 30, Capt. Rorrer instructed Harris to discontinue his personal investigation of Grey and Gamble during office hours and not "to pursue this matter further as a police officer."

Harris then filed his own Internal Affairs complaint against Van Auken and Rorrer. While the investigation of this complaint was proceeding, Harris was transferred into a different precinct in order to relieve tensions. On January 19, 1993, Internal Affairs found Harris' claims to be unfounded.

On July 30, 1993, after midnight, Harris appeared before a magistrate. He was in uniform and on duty. He testified that Van Auken had illegally directed the release of Gamble, illegally withheld service of the Grey warrant, and illegally submitted a false letter to the court in order to secure the dismissal of the charges Harris brought against Gamble. Based solely on Harris' testimony, the magistrate issued a summons charging Van Auken with obstruction of justice and corruptly failing to serve a warrant.

As one might expect, the summons caused quite a stir within the department. On August 6, the chief of police called a meeting, which was attended by Van Auken and Captains Rorrer, Beane, and Baker. A consensus was reached that Harris should be discharged. Captain Beane prepared the formal Personal Conduct Report stating the reasons for Harris' termination -- disobedience of orders and abuse of position. The termination was effective August 19.

Harris appealed his dismissal to the City Personnel Review Board. A full hearing was held September 2. The Board upheld the dismissal on September 7, in a letter containing one sentence of analysis: "The Board found that the City proved its case."

Harris filed this suit in district court on November 23, 1993, against the City, Van Auken, Beane, and other individual city officials. He pled a 42 U.S.C. § 1983 First Amendment retaliatory discharge claim and a supplemental common-law claim for wrongful discharge in violation of the public policy of Virginia.

A jury trial was held in July 1994, with equitable issues (e.g. reinstatement) tried simultaneously to the court. At the close of Harris' case, the court dismissed his § 1983 claim against the individual defendants (but not the City) as barred by qualified immunity, but he permitted Harris to proceed against all defendants on his state law claim.

4

The jury found for Harris on both claims. Against the City, the jury
awarded $41,712 in compensatory damages on the § 1983 claim and
$125,000 compensatory (for "loss of professional opportunity") and
$200,000 punitive damages on the wrongful discharge claim. The
individual defendants were assessed punitive damages of $100 each.

The court, ruling on the equitable issues, ordered Harris reinstated
and granted back pay of $43,000. The court also struck the punitive
damages against the individuals. In a later order following a motion
by the City, the court struck the punitive damages against the City and
reduced the award of compensatory damages for loss of professional
opportunity to its present value of $99,188.

Both Harris and the City appealed. The case was heard by a panel
of this court, which reversed and remanded. <u>Harris v. City of Virginia
Beach</u>, No. 94-2091(L) (4th Cir. Oct. 30, 1995). We held that, as a
matter of law, Harris' speech was simply a private employment-
related grievance and not speech as a citizen on matters of public con-
cern. Therefore, the § 1983 judgment could not stand.

Rather than rule on the issues raised by the parties concerning the
common-law wrongful discharge claim, we remanded for the district
court to consider the continuing vitality of that claim in light of the
reversal on the § 1983 judgment.

On remand, the City moved to dismiss the claim. It argued that the
decision of the grievance board was final and binding and thereby
precluded any tort claim based on the discharge. It also argued that
our ruling that Harris' speech to the magistrate was not protected by
the First Amendment required the same ruling with regard to its vio-
lating Virginia public policy. In the alternative, the City moved for a
new trial on the ground that the jury's finding of a violation of public
policy was unfairly influenced, if not practically compelled, by the
trial court's erroneous ruling that the statements were protected by the
First Amendment.

The district court denied the City's motions, and reentered judg-
ment for Harris. The City appeals. We review the district court's legal

conclusions <u>de novo</u> and its denial of a new trial for abuse of discre-
tion.

5

II.

At the time of Harris' discharge, Virginia law provided for local governments to have personnel grievance boards. The decisions of these boards were "final and binding" and were required to be "consistent with law and policy." Va. Code § 2.1-114.5(d)(4)(d) (Michie Supp. 1993; repealed 1995). The Virginia Supreme Court has enforced grievance board decisions in the face of arguments that they are non-binding recommendations. Zicca v. City of Hampton, 240 Va. 468, 397 S.E.2d 882 (1990); Angle v. Overton, 235 Va. 103, 365 S.E.2d 758 (1988). The City argues that the binding nature of Harris' grievance board loss bars his wrongful discharge claim.

Harris counters that the City has waived this defense.[1] We need not consider this issue, because the decision of the grievance board cannot be binding here.

The one-sentence board analysis -- "The Board found that the City proved its case" -- tells us nothing about its findings of historical fact. Consequently, we cannot know whether its application of "law and policy" to those facts was proper.

At the time of this board hearing and decision, the statute spoke in the conjunctive: the decision is "final and binding" and must be consistent with "law and policy." The district court held that it had at least enough jurisdiction to inquire into the consistency with law and policy and to ignore any board decision it found wanting. In neither Zicca nor Angle, the two cases relied on by the City, was this aspect of the board's decision challenged.

We agree with the district court. Though we have upheld the Virginia grievance procedure against due process challenges arising from its failure to provide a judicial forum for or review of factfinding, we

_____

[1] While its answer invokes a pro forma Rule 12(b)(6) defense, the City did not, by motion or otherwise, expressly assert this legal theory of defense before trial. However, in its reply brief in this appeal, the City cites two excerpts from the discussion of the jury charge in which

it
refers -- albeit obliquely -- to the binding nature of grievance board
decisions where there are no constitutional claims.

have acknowledged that courts must occasionally play a role, e.g. determining grievability, selecting a third member for the panel, or implementing the decision. Layne v. Campbell Co. Dep't of Social Services, 939 F.2d 217, 221 (4th Cir. 1991). It follows that purely legal defects in the grievance decision could be raised in court to resist its implementation. Indeed, the Layne panel stated that the grievance board decision "is final and binding, but it must be consistent with law and written policies." Id. (emphasis added).

Finally, our understanding of the court's role is congruent with the personnel statute as rewritten by the Virginia General Assembly in 1995. Grievance boards are now expressly required to make findings of fact and conclusions of law, and the decision is final and binding "if consistent with law and policy." Va. Code § 2.1-116.07(C)(iii) (Michie 1995) (emphasis added).

There is simply no way that we can know whether this grievance board decision was consistent with law and policy, and so we cannot give it preclusive effect.

III.

We now turn to the substantive viability of the wrongful discharge judgment in light of our reversal of the § 1983 judgment. At the outset, we agree with Harris and the district court that our ruling that Harris' statements were not protected by the First Amendment does not necessarily mean that they were not protected by Virginia or City public policy. For example, a police officer has a duty to report crimes, e.g., Va. Code § 15.1-138 (Michie Supp. 1996) (listing among a policeman's duties that he "shall detect and arrest offenders against the [law]"), and a city ordinance expressly protects employee whistle-blowers from retaliation. Code of the City of Virginia Beach § 2-129(a)(5). These policies obviously have purposes beyond protecting free speech; just as obviously, and as is the case here, they are often implicated by and intertwined with speech issues.

At the very outset of trial, the district court informed the jury that it had already ruled that the statements were protected expression under the First Amendment. This court ruled precisely the opposite as a matter of law. We cannot envision how the jury, instructed as it

was, could have concluded anything else but that Harris' statements were protected by public policy as well. Free speech and liberty of conscience have been the public policy of Virginia for longer than there has been a United States. Can we be confident that a jury of Virginians, instructed that protected speech had occurred, both based its verdict on an ostensibly non-speech public policy and disregarded the protected nature of the speech in assessing Harris' actions vis-a-vis that policy? We surely cannot. The appropriate remedy is a new trial.**2**

The judgment of the district court is reversed, and the case is remanded. We leave to the district court's discretion whether to continue to exercise supplemental jurisdiction under 28 U.S.C. § 1367. The court may proceed to a new trial or dismiss the suit without prejudice to its being refiled in state court.**3**

REVERSED AND REMANDED

_____

**2** The City also challenges several aspects of the damages awarded to Harris. Our grant of a new trial moots these issues.
**3** **See** 28 U.S.C. § 1367(d).

8